the gas light company, upon pleadings presenting that precise issue, has judicially determined that said contract, in the respect here involved, was a valid contract, and the answer which pleads this decree avers that the gas light company and the directors in good faith defended said action in the state court, and are now defending the same, and further avers that the decree in the said suit, which is in full force, is binding upon the gas light company, its directors and stockholders, including the complainant. A decree thus rendered upon adverse proceedings, and without fraud and collusion, is binding upon the gas light company, and upon its stockholders; and the latter cannot as we said when the injunction asked for was denied, afterwards draw the litigation into a federal court in a suit between themselves and the litigants in the state court. If this could be done, there would be no end to a suit against a private corporation so long as any stockholder should see fit to re-litigate the same controversy in his own name.

The exceptions to the answer are disallowed. Ordered accordingly.

---

CHAFLIN (UNITED STATES v.). See Case No. 14,775.

CHAIN AND ANCHOR (CROWELL v.). See Case No. 3,443.

CHAIN CABLE (UNITED STATES v.). See Case No. 14,776.

CHALMERS v. HOWELL. See Cases Nos. 9,302 and 9,303.

---

## Case No. 2,573a.

CHALMERS SPENCE PAT. NON-CONDUCTOR CO. v. CRAMP et al.

[5 Ban. & A. 66.] [1]

Circuit Court, E. D. Pennsylvania. Jan., 1880.

PATENTS—"STEAM BOILER COVERING"—VALIDITY.

The letters patent, No. 55,598, granted June 19th, 1866, to John Ashcroft, the claim of which is for "covering a steam boiler, pipe or other heater with felt or other non-conducting material, when the latter is supported on a framework removed from and surrounding the former, not being in direct contact, but having an air-space intervening between said felt and boiler, pipe or other heater, constructed and operated substantially in the manner described and for the purpose set forth:" Held, to be valid.

[Cited in Chalmers Spence Patent Non-Conductor Co. v. Pierce, 9 Fed. 152.]

[In equity. Bill for injunction by Chalmers Spence Patent Non-Conductor Company against William H. Cramp and others for the alleged infringement of letters patent No. 55,598, granted to John Ashcroft June 19, 1866.]

---

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

E. B. Barnum, for complainants.

Charles B. Collier and W. W. Ledyard, for defendants.

McKENNAN, Circuit Judge. There is no substantial contest here touching the infringement of the complainants' patent by the defendants. Indeed, there is no denial of infringement in the answer as charged in the bill. The defence is rested upon the alleged invalidity of the patent, for the reason that the patentee was not the first and original inventor of the thing claimed; and various patents are referred to and allegations of prior use are made, which are charged as anticipatory of the patentee's invention. A careful consideration and comparison of the patents referred to and of the devices proved, although indefinitely and unsatisfactorily, to have been used experimentally before the date of the patent in controversy, have led me to the conclusion that they are substantially distinguishable, and that the assault upon the patent must be regarded as having failed. I do not propose to assume the burden of stating in detail the reason for this conclusion, but to express it generally, and to direct that a decree for an injunction and an account be entered in favor of the complainants.

[NOTE. For another case involving this patent, see Chalmers Spence Pat. Non-Conductor Co. v. Pierce, 9 Fed. 152.]

---

CHALMETTE, The (The BOLIVAR v.). See Cases Nos. 1,609–1,611.

CHALONER (UNITED STATES v.). See Case No. 14,777.

---

## Case No. 2,574.

In re CHAMBERLAIN et al.

[3 N. B. R. 710 (Quarto, 173).] [1]

District Court, E. D. Michigan. March 28, 1870.

BANKRUPTCY—FRAUDULENT PREFERENCE—EXCLUSION OF PREFERRED CREDITOR FROM CHOICE OF ASSIGNEE.

1. Whether a creditor who had received a conveyance of property made with intent to defeat or delay the operation of the bankrupt act [14 Stat. 534], having reasonable cause to believe a fraud on the bankrupt act was intended, may prove his claim and vote for assignee? At the time of the delivery of the bond and mortgages, an act of bankruptcy was close at hand, the mortgagee, of the firm Allan Shelden & Co., being well apprised of the facts. The assignment was not general, for the benefit of all the creditors, but conditional; the mortgagee having no power whatever over the real property for six months, and the personal property encumbered by a specific reservation. The motion was to exclude the firm of Allan Shelden & Co., and other creditors who had expressed themselves satisfied with the transaction, from participation in the choice of assignee, and to postpone the proof of their claims. Held, it is the character of the instrument which is the subject of discussion; and if the exercise of the powers granted by it would defeat or delay the

---

[1] [Reprinted by permission.]

operation of the bankrupt act, then such would be presumed to have been its intention.

[Cited in Re Union Pac. R. Co., Case No. 14,-376.]

2. The disposition of property under it was complete on the day of the execution and delivery of the bond and mortgages; and the intent existing at that time determines the character of the transaction.

3. The proof of the claim of Allan Shelden & Co. should be postponed until after the choice of an assignee.

4. The motion to exclude the other creditors mentioned from participation in the choice of assignee, ought to be denied.

On certificate of register in bankruptcy. [In the matter of Eli B. and Owen P. Chamberlain.]

Before Mr. Hovey K. Clarke, register in bankruptcy:

I, the said register, do hereby certify that in the course of proceedings before me at the meeting of creditors for the choice of an assignee of said bankrupt's estate, the attorney for the petitioning creditors moved that the proof of the claim tendered by Allan Shelden & Co., and the proofs of the claims filed by Beatty, Fitzsimons & Co., A. C. McGraw & Co., W. D. Robinson, Burtenshaw & Co., E. Lieberman, and Geo. B. Kelley & Co., be postponed until the assignee is chosen, on the ground that said claimants had received a conveyance of the property of said bankrupts, made with intent to defeat or delay the operation of the bankrupt act, having reasonable cause to believe that a fraud upon the bankrupt act was intended, and that said bankrupts were insolvent. The said claimants being present and insisting upon their right to vote for assignee, questions of fact and law were presented and stated by the parties, Mr. Dickinson appearing for petitioning creditors and Mr. Driggs for the claimants whose rights to vote were objected to, and thereupon witnesses were examined relative to the facts in controversy between the parties.

In April, 1869, the bankrupts, then doing business as partners in Brockway, St. Clair county, finding themselves in embarrassed circumstances, sought an interview with Mr. Allan Shelden, of the firm of Allan Shelden & Co., and stated to him that their stock had been attached; that one of their creditors would probably take a judgment against them the next day, and, as Mr. Shelden thinks, the other creditors would take judgments against them at the same term of court. That this statement truly represented the then existing condition of the affairs of the Chamberlains is not controverted. This interview resulted, after consultation with counsel, in the execution by the bankrupts and the delivery to Mr. Shelden of a bond, bearing date April 22d, 1869, in the penal sum of eighteen thousand dollars, reciting the indebtedness of the Chamberlains to various persons and firms, in divers sums of money—neither names of persons nor sums of indebtedness being specified—amounting in the aggregate to about nine thousand dollars, as near as they could estimate the same, and which they further recite "they are desirous of securing." The condition of the bond is declared to be the payment within six months or sooner, if they should be able to do so, of all just debts which they were then owing and liable to pay, with interest; and also to pay any future indebtedness which they may incur to the firm of Allan Shelden & Co., for goods or merchandise which said firm may advance to them. The performance of the condition of this bond was secured by two mortgages, one upon a considerable quantity of real estate in the counties of St. Clair and Sanilac, and a chattel mortgage of all the personal property of the Chamberlains in their store at Brockway, of a quantity of lumber and saw logs, and some other specified articles. The chattel mortgage contained the further condition that the mortgagors "may sell any or all of the property above described in the usual course of business, the avails of such sales to be applied in accordance with the condition of the bond above referred to. The party of the second part may at any time take possession of the property hereby mortgaged." The trust created by these instruments was accepted by Mr. Shelden; the greater part of the personal property has been sold, and a considerable portion of it converted into money. No subsequent advances have been made by the firm of A. Shelden & Co., as provided for in the bond. It does not appear that any of the creditors whose right to vote for assignee is objected to, had any knowledge of the transaction between the Chamberlains and Mr. Shelden previous to the execution and delivery of the papers. They all, however, in terms more or less explicit, have since the transaction expressed themselves satisfied with it.

By Hovey K. Clarke, Register:

It is clear that at the time of the interview with Mr. Shelden the Chamberlains were insolvent. They were unable to pay their debts in the ordinary course of business, and this inability was of a character, as the proof shows, which would result in the eventual breaking up of their business. Their goods were attached, several suits were pending against them, on one of which it was expected judgment would be entered the next day, and on the others during the same term of the court. In these circumstances, it is evident, an act of bankruptcy was close at hand. If they remained inactive, they had reason to expect that an execution would be levied on their property within forty-eight hours. To remain thus inactive would be to "suffer their property to be taken on legal process," which would justify a proceeding by their creditors against them to have them adjudicated bankrupts. In re

Black [Case No. 1,457]; In re Dibble [Id. 3,884]. They could prevent this by filing a voluntary petition to be adjudged bankrupts. By one or the other of these methods an act of bankruptcy seemed inevitable. By resorting to the voluntary method they could have effectually precluded the involuntary, and they would have submitted all their property to be distributed as provided by the law of the land, and under the control and guaranties that the rights of all creditors will be protected, which those laws afford. For some reason which is not stated, and which therefore can only be inferred from their acts, they do not resort to the method prescribed by the bankrupt act to prevent the preference which the judgment creditors were likely to obtain. They state their condition to Mr. Shelden, so that he becomes well informed as to all the essential facts affecting their liabilities and their ·duties, and, after consultation with counsel, the method of the bond and mortgages which have been proved in this case, was adopted to prevent the levy of the impending execution. It is insisted that this was done to protect the property for the benefit of all the creditors, the proceeds of which were to be distributed among them equally without preference.

It is to be observed, however, that the conveyance to Shelden was not a general assignment for the benefit of the creditors, such as would authorize him to proceed at once to convert the· property and distribute the proceeds. The conveyances are conditional—one mortgage on the real estate, and the other upon personal property—conditioned to pay all the mortgagors' creditors, and also what they may in addition become indebted to A. Shelden & Co. within six months; during which period Shelden could exercise no rights whatever over the real .property, and his right to take possession of the personal property was encumbered by a reservation of the mortgagors' right to continue to sell the property mortgaged in the usual course of business. If this were a general assignment for the benefit of creditors, it is difficult to see how it could be sustained under the well settled principles which require such an assignment to fix definitely the rights of the parties and of those to be benefited by it, and especially to be free from all control whatever by the assignor of the property assigned. The reservation of the right to continue to sell the mortgaged property, and the agreement that the security should embrace any subsequent indebtedness of the Chamberlains to the firm of A. Shelden & Co., are clearly inconsistent with the principles above referred to, and which are supposed to be well settled as applicable to the construction of assignments for the benefit of creditors. Instead of making an unconditional surrender of their property for the benefit of their creditors, they seek to convert it into a special trust, by which, at the option of the parties, it may

be employed indefinitely as a basis on which to continue their business; and if they were doing an unprofitable business, the property which ought to be distributed to creditors, existing at the time of the transaction, may be used to protect the interests of the firm in which the trustee was a partner, against loss from the business thus continued. It is no answer to this to say that this power was not actually exercised—that no further advances were made. It is the character of the instrument which is the subject of discussion; and if the exercise of the powers granted by it would defeat or delay the operation of the bankrupt act, then such will be presumed to have been its intention. The disposition of property under it was complete on the day of the execution and delivery of the bond and mortgages; and the intent existing at that time determines the character of the transaction.

As mortgages, however, the same objections recur with increased force, and establish the inconsistency of such conveyances with the general policy of the bankrupt act not only, but the provisions of section 39 of that act in particular. [14 Stat. 536.] The general policy of the bankrupt act demands that the property of an insolvent shall be taken charge of by the officers of the bankrupt court, where all creditors have an opportunity to assert their rights, where the utmost publicity as to all proceedings is secured, and where the bankrupt's estate is to be converted and distributed by public officers, directed and controlled by a statute which provides speedy and summary methods to enforce it and protect the rights of all parties. In this case, the Chamberlains were in circumstances that inactivity merely would expose them within forty-eight hours, probably, to the compulsory process of the bankrupt court. They might avoid it by becoming voluntary petitioners to be adjudicated bankrupts. They decline .to do this, and execute instead certain mortgages, which if valid, not only set their creditors at defiance for six months, but secure for them the right, with the consent of a party selected by themselves, to continue their business, including the purchase of more goods, until a breach of the condition of the mortgages. If they can do this legally for six months, it is difficult to see how in principle they can be restrained from securing like immunity for six years by the same method. Its effect, unquestionably, is not only to delay the operation of the bankrupt act, but if sustainable at all, may be employed to defeat it altogether. The involuntary clauses of the bankrupt act may as well be repealed—for a time mortgage will be always effectual to set them all at defiance. Such is the practical and necessary effect of such a disposition of property as is proved in this case; and the law conclusively presumes that such effect was intended by the parties to it.

Who were the parties to it? The two

Chamberlains, the bankrupts, and Mr. Allan Shelden. All the facts which give character to the transaction are shown to be known to Mr. Shelden before he took the bond and mortgages. The intent of the mortgagors is thus brought home to the mortgagee, and the consequences, as declared by the last sentences of section 39, that a creditor having "reasonable cause to believe that a fraud on the act was intended, and that the debtor was insolvent, shall not be allowed to prove his debt in bankruptcy," the petitioning creditors contend exclude the proof of the debt due to Allan Shelden & Co., and at any rate are sufficient to justify the postponement of the proof of the claim until after the choice of an assignee. I do not understand that any point has been made that the objections which might exist to the proof of a claim by Allan Shelden, on account of his participation with the bankrupts in the purpose to defeat or delay the operation of the act, do not apply to Allan Shelden & Co. If proved at all, it must be proved in favor of all the partners—as creditors they cannot sever. The penalty therefore which the act imposes cannot be visited upon Mr. Shelden unless his partners are also involved in its effect. It is unnecessary, however, to discuss this question, for whatever there may be in it, enough I think appears to require the postponement of the proof of the claim of Allan Shelden & Co., until after the choice of an assignee.

The motion to exclude the other creditors named, to wit: Messrs. Beatty & Fitzsimons, A. C. McGraw & Co., W. D. Robinson, Burtenshaw & Co., E. Lieberman, and George B. Kelley & Co., rests upon the proof that they have expressed themselves as satisfied with the arrangement entered into between the bankrupts and Mr. Shelden. It does not appear that they had any knowledge whatever of the facts that make up the intent to defeat the operation of the bankrupt act, until after the bond and mortgages were given, nor that they were consulted concerning it, or in any way accepted it, except to declare that they were satisfied with it. In no sense can it be said that they have received the conveyances which it is alleged were given, with the intent to defeat the operation of the bankrupt act. The conveyances were not to them directly or indirectly; they were complete before these creditors had any knowledge of them. There is, therefore, not only no proof of the alleged intent, but there is no fact proved from which any such intent on their part can be inferred.

I am of opinion, therefore, that the motion to exclude them from participation in the choice of an assignee ought to be denied.

LONGYEAR, District Judge. I fully concur in and approve of the foregoing views and conclusions of the register.

## Case No. 2,575.

CHAMBERLAIN et al. v. CHANDLER.

[3 Mason, 242.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1823.

ADMIRALTY JURISDICTION OF TORTS.

1. The admiralty has jurisdiction of personal torts and wrongs committed on a passenger, on the high seas, by the master of the ship.

[Cited in Thomas v. Gray, Case No. 13,898; Waring v. Clarke, 5 How. (46 U. S.) 488; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 434; The Aberfoyle, Case No. 16; Crapo v. Allen, Id. 3,360; Smith v. Wilson, Id. 13,128; Pendleton v. Kinsley, Id. 10,922; The City of Brussels, Id. 2,745; White v. McDonough, Id. 17,552; Simpson v. The Ceres, Id. 12,881. Distinguished in McGuire v. The Golden Gate, Id. 8,815.]

2. It is immaterial whether such torts be by direct force, as trespasses, or consequential injuries.

[Cited in Waring v. Clarke, 5 How. (46 U. S.) 468; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 432; The Highland Light, Case No. 6,477. Distinguished in The David Reeves, Id. 6,625.]

This was a libel in the admiralty, brought by the libellants, (being husband, wife, and children,) who were passengers on board of the ship Pearl, on a voyage from the island of Woakoo to Boston, against the defendant, who was master of the ship, for the voyage, for damage, for asserted ill-treatment and injuries to them during the voyage. The defendant put in, by way of answer, an allegation denying the ill-treatment and injuries. The cause came to be heard upon the evidence.

Hubbard and Webster, for libellants.

T. Fuller, for defendant.

STORY, Circuit Justice. No exception has been interposed against the jurisdiction of the court in this case. I wish however that it should be understood, that the point has not passed sub silentio; but that it has attracted the consideration of the court. The contract itself is a maritime contract, for the conveyance of passengers on the high seas, and the wrongs complained of, are gross ill-treatment and misconduct in the course of the voyage, while on the high seas, by the master, in breach of the stipulations necessarily implied in his contract, of the duties of his office, and of the rights of the libellants, under the maritime law. The jurisdiction of courts of admiralty over torts, committed in personam on the high seas, has never, to my knowledge, been doubted or denied by the courts of common law, and has been often recognised by adjudications in the admiralty. 2 Brown, Civ. & Adm. Law, 108; 3 Bl. Comm. 106. In 4 Inst. 134, the common law judges admitted, in the fullest manner, that "of contracts, pleas, and quereles made upon the

---

[1] [Reported by William P. Mason, Esq.]